Hans W. Herb (SBN 136018)
LAW OFFICE OF HANS W. HERB
P.O. Box 970
Santa Rosa, CA  95402
Telephone:  (707) 576-0757
Email:  hans@tankman.com

Craig A. Brandt (SBN 133905)
LAW OFFICE OF CRAIG A. BRANDT
5354 James Avenue
Oakland, CA  94618
Telephone:  (510) 601-1309
Email:  craigabrandt@att.net

Attorneys for Plaintiff
EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC, a California limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> NORCAL MATERIALS, INC., dba HARBOR READY MIX, a California corporation, U.S. CONCRETE, INC., a Delaware corporation; BOBBY LEE MANN, an individual, HERB BURTON, an individual; ROBERT McGEHEE, an individual, and DOES 1-10, inclusive, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

## INTRODUCTION

1.      This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendants for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

2.      On or about September 23, 2018, EDEN provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) Defendants, as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.      A copy of EDEN's Notice of Intent to Sue is attached hereto as Exhibit "A".

4.      More than sixty days have passed since EDEN's Notice was served on Defendants, the State Board, and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief),

33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

6.      Venue is proper because Defendants reside in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

## PARTIES

7.      Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an environmental membership group organized under the laws of the State of California. Its members work to protect, enhance, and assist in the restoration of rivers, creeks, streams, wetlands, vernal pools, and their tributaries located in California.  Members of EDEN reside and work near the San Francisco Bay and its tributaries, and use those waters and their watersheds for recreation, sports, fishing, swimming, hiking, photography, nature walks and scientific study. Their use and enjoyment of these natural resources are specifically impaired by defendant's violations of the CWA.

8.      Defendants' ongoing violations of the General Permit and the CWA will cause irreparable harm to EDEN and its members, for which they have no plain, speedy, or adequate remedy. The relief requested will redress the ongoing injury in fact to EDEN and its members.

9.      EDEN is informed and believes, and on such information and belief alleges, that Defendant NORCAL MATERIALS, INC. was formed on or about August 14, 2017, as a California corporation, and is identified in the Regional Board's records as one of the current Industrial General Permit applicants and operators of the Harbor Ready Mix facility located at 123 Seaport Boulevard in Redwood City, California ("the Facility").   NORCAL MATERIALS,

INC's parent company U.S. CONCRETE, INC. purchased Harbor Ready Mix from CENTRAL

SUPPLY COMPANY on or about October 2, 2017.

10.    EDEN is informed and believes, and on such information and belief alleges, that

Defendant U.S. CONCRETE, INC, a Delaware corporation, is the parent company of NORCAL

MATERIALS, INC.

11.    EDEN is informed and believes, and on such information and belief alleges that

Defendant HERB BURTON is the Vice President and Legally Responsible Person for Defendant

NORCAL MATERIALS, INC.

12.    EDEN is informed and believes, and on such information and belief alleges that

Defendant BOBBY LEE MANN is the General Manager of and the Duly Authorized

Representative for NORCAL MATERIALS, INC.

13.    EDEN is informed and believes, and on such information and belief alleges that

Defendant BOBBY LEE MANN is also the President and CEO of CENTRAL SUPPLY

COMPANY, which formerly owned Harbor Ready Mix prior to its being purchased by

Defendant NORCAL MATERIALS, INC.  CENTRAL SUPPLY COMPANY currently

maintains a NPDES Permit at the Facility and is identified in the Regional Board's records as

one of the current Industrial General Permit applicants and operators of the Harbor Ready Mix

Facility.   Defendant BOBBY LEE MANN is the designated Legally Responsible Person for

CENTRALSUPPLY COMPANY's NPDES Permit.

**STATUTORY BACKGROUND**

14.    Congress declared that the Federal Clean Water Act was designed to "restore and

maintain the chemical, physical, and biological integrity of the Nation's waters" through federal

and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

15.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

16.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

17.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

General Permit

18.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991 and modified it on September 17, 1992.  The State Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect

between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

19.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

20.     The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

21.     Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

22.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit

by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

23.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

24.    To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X(B).

25.    Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet §I(1).

26.    Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

27.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

28.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, § X(H)(4), (5).

29.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

30.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

31.     Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

32.    A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit §XI(B)(2)

33.    Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit § XI(B)(4)

34.    Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, § XI(A)

35.    The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV.

36.    Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, § XI(B)(6)(c).

37.    The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water

discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

38.    The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

39.    The following annual NALs have been established under the General Permit for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("S.U."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L; iron – 1.0 mg/L.

40.    An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit §XII(A)

41.    When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit § XII(C)

42.    For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the

exceedance is solely due to the presence of the pollutant in the natural background. General Permit §XII(D)

43.    Section XVI(A) of the General Permit requires that all Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

44.    Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a legally responsible party or duly authorized representative of the Facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

45.    Section XXI(N) of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both. *See* also Clean Water Act section 309(c)(4)

46.    The Water Quality Control Board, San Francisco Bay Region has adopted the "San Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by Resolution No. R2-2010-0100, setting forth the Water Quality Standards ("WQS") and beneficial uses for San Francisco Bay and its tributaries.

47.    The Beneficial Uses for San Francisco Bay are: industrial service supply, shellfish harvesting, fish migration, preservation of rare and endangered species, fish spawning, commercial and sportfishing, estuarine habitat, wildlife habitat, recreational activities involving contact with water, recreational activities involving proximity to water, and navigation. *See* Basin Plan, Table 2-1.

48.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

49.    Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife. Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.  WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

50.    The Basin Plan sets forth, among other things, narrative WQS for floating material, O&G, sediment, settleable matter, and suspended materials, and sets forth numeric WQS for pH, arsenic, cadmium, chromium VI, copper, cyanide, lead, mercury, nickel, selenium, silver, tributyltin, zinc, and PAHs. *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-3.3.14, 3.3.21, and Table 3-3.

51.    The Basin Plan also includes site specific objectives ("SSOs"), which are WQS for specific sites, for certain pollutants of concern, including copper and nickel. *See* Basin Plan, Table 3-3A.  The CTR includes numeric criteria set to protect human health and the environment in the State of California. Water Quality Standards.

52.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitations in Section VI(A) of the General Permit.

Citizen Suit Provision of the CWA

53.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation." 33 U.S.C. §1365(a)(1). No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator of the EPA, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

54.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192 per day for each violation." 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

55.     Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

## FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

56.    Harbor Ready Mix is a Portland Cement concrete batch plant.  EDEN is informed and believes that the Facility falls under standard industrial classification ("SIC") code 3273 (Ready-Mix Concrete).

57.    EDEN is informed and believes that Harbor Ready Mix stores industrial materials outdoors that can be exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

58.    Based on EDEN's investigation, including a review of the Facility's Notices of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, and EDEN's information and belief, storm water is collected and discharged from the Facility through a series of channels that discharge via at least one outfall. The outfall discharges storm water and pollutants contained in that storm water directly into Redwood Creek, which flows into the San Francisco Bay.

59.    Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the facility may settle onto the ground. Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water channels.

60.    On information and belief, Plaintiff alleges that the majority of storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

61.     The Facility lacks sufficient structural controls to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants and to prevent the discharge of water once contaminated. The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

62.     Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

NPDES Coverage Issues Under the General Permit

63.     Defendant NORCAL MATERIALS, INC. began its operations at the Facility on or about October 2, 2017.

64.     Defendant operator's SIC code required it to obtain NPDES coverage under the General Permit.

65.     Between October 2, 2017, and December 5, 2018, NORCAL MATERIALS operated the Harbor Ready Mix facility without obtaining NPDES coverage under the General Permit.   Prior to that date, Defendant NORCAL MATERIALS was discharging storm water into the San Francisco Bay watershed without an NPDES permit and had failed to take action to prevent or minimize such discharges, in violation of the CWA.

66.     Furthermore, Defendant BOBBY LEE MANN, as Legally Responsible Person for the NPDES Permit in the name of CENTRAL SUPPLY COMPANY, and as General Manager and Duly Authorized Representative for NORCAL MATERIALS, INC., has continually been in charge of compliance with the General Permit at the Facility since July 1, 2015, and furthermore has failed to date to file a Notice of Termination of coverage under the Permit in the name of CENTRAL SUPPLY COMPANY.   Thus, Plaintiff alleges that Defendant BOBBY LEE MANN

remains personally responsible for the CWA and General Permit violations at the facility from at least July 1, 2015, through the present.

Deficient/ Non-Existent SWPPP/Failure to Follow SWPPP; Fraudulent SWPPP

67. On information and belief, Plaintiff alleges that since at least July 1, 2015, Defendants have failed to implement an adequate SWPPP for the Facility.

68. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP uploaded into SMARTS for CENTRAL SUPPLY COMPANY's NPDES Permit does not set forth site-specific Best Management Practices (BMPs) for the Facility that are consistent with BAT or BCT for the Facility and generally does not comply with the requirements of Sections X(G)(1)(e), X(G)(2), and X(H) of the General Permit.

69. Plaintiff is informed and believes, and thereupon alleges, that between October 2, 2017, and November 30, 2017, Defendant NORCAL MATERIALS failed to develop and implement any SWPPP at the Harbor Ready Mix facility.

70. In addition, Plaintiff alleges that on November 30, 2018, Defendants uploaded a SWPPP into SMARTS which included intentionally false and fraudulent statements made by Defendant ROBERT McGEHEE under penalty of law.

71. Specifically, Defendant ROBERT McGEHEE (Defendant NORCAL MATERIALS's in-house Qualified Industrial Stormwater Practitioner (SWPPP) certified on November 30, 2018, that the SWPPP Defendants uploaded or caused to be uploaded into the SMARTS system had been prepared by him and/or NORCAL MATERIALS on December 1, 2017, and implemented on January 1, 2018, during a time period that Defendant NORCAL MATERIALS had not yet applied for NPDES coverage; when in actuality, the SWPPP was not prepared by Defendant ROBERT McGEHEE, until November 29, 2018, after the 60-day Notice

period had expired on EDEN's Notice of Intent to Sue, and just after Defendants NORCAL MATERIALS, INC. and U.S. CONCRETE, INC. retained legal counsel to advise them on this matter.

72.    According to information available to EDEN, neither of Defendants' SWPPPs have been evaluated to ensure effectiveness nor revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPPs do not include each of the mandatory elements required by the General Permit.

73.    Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed and continue to fail to alter the Facility's SWPPPs and site-specific BMPs consistent with the General Permit.

74.    In addition, Plaintiff alleges that Defendants have failed to comply with the provisions of its current SWPPPs in the areas of monitoring and reporting as provided by the SWPPPs.

75.    Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into Redwood Creek, which flows into the San Francisco Bay.

76.    Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

Monitoring and Reporting

77.    On information and belief, EDEN alleges that Defendants have an inadequate monitoring program at the Harbor Ready Mix facility.

78.     On information and belief, EDEN alleges that during the 2017-2018 reporting year, Defendants failed to collect and analyze any storm water samples at the Harbor Ready Mix Facility.

79.     On information and belief, EDEN alleges that Defendants have failed to conduct monthly visual observations of storm water discharges at the Facility since at least July 1, 2015.

80.     On information and belief, EDEN alleges that Defendants have taken samples of storm water discharges at the Facility that failed to comply with the General Permit's requirement that samples be preceded by a period without a discharge.  Specifically, EDEN alleges that the following sampling dates were not preceded by the required period without a discharge: December 22, 2015; March 11, 2016; December 8, 2016; January 10, 2017; and January 19, 2017.

81.     EDEN is informed and believes that Defendants have failed to analyze the Facility's storm water samples for the required parameters, in violation of Section XI(B)(6) of the General Permit.  Specifically, Section XI(B)(6)(d) of the General Permit requires additional sampling parameters of Iron, which is required based on the Facility's SIC code of 3273 (Ready-Mix Concrete).  Defendants' laboratory analytical reports for samples dated November 2, 2015; December 22, 2015; January 19, 2016; and March 11, 2016, all failed to analyze for the required parameter of Iron.

82.     On information and belief, EDEN alleges that Defendants have failed to deliver the Facility storm water samples to a qualified Laboratory within 48 hours of collection, pursuant to Attachment H, Section 2 of the General Permit.  Specifically, the samples Defendants collected on March 11, 2016; December 8, 2016; and January 19, 2017, were not delivered to its Laboratory within 48 hours of collection.

Falsification of Annual Reports

83.    EDEN is informed and believes that Defendants have submitted falsified Annual Reports to the Regional Water Quality Control Board in violation of Sections XXI(L) and XXI(N) of the General Permit.

84.    Specifically, on July 18, 2018, Harbor Ready Mix submitted its Annual Report for the Fiscal Year 2017-2017.  The Report was signed under penalty of law by Defendant BOBBY LEE MANN.

85.    The 2017-18 Annual Report included Attachment 1 as an explanation for why Defendants failed to sample the required number of Qualifying Storm Events during the reporting years for all discharge locations, in accordance with Section XI.B.  Defendant BOBBY LEE MANN certified in the report, under penalty of perjury, that the required number of samples for the reporting period was not collected by the Facility because there were insufficient qualifying storm water discharges occurring during the reporting year and scheduled facility operating hours.

86.    Records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the fiscal year 2017-18, there were sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow Defendants to collect the requisite number of samples, as delineated above.

87.    Based on the foregoing, Plaintiff alleges that BOBBY LEE MANN intentionally made a false statement in the Facility's 2017-18 Annual Report when he indicated that there

were insufficient QSEs during the reporting year to allow the facility to collect the required number of storm water samples.

Failure to Implement BAT/BCT and BMPs

88.     EDEN is informed and believes that Defendants have failed to identify and implement Best Management Practices ("BMPs") at the Harbor Ready Mix Facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.  General Permit §§ I(C), V(A).

89.     For example, a Qualified Industrial Stormwater Practitioner (QISP) hired by Defendants to evaluate the Facility after it entered Level 1 status for pH and TSS noted the following continuing BMP deficiencies:

(a)     Chemical storage totes were stored on-site without secondary containment
(b)     Raw materials were stored outside of a bunker near the discharge/sample point
(c)     Raw bulk materials storage was observed tracked through the facility by trucks
(d)     Straw wattles were unsecured and worn
(e)     Rusted metal stored outdoors uncovered and directly on the ground
(f)     Insufficient dust minimization and sweeping observed at facility

90.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the Redwood Creek, a tributary of the San Francisco Bay.

Discharges of Contaminated Storm Water

91.     Since November 2, 2015, Defendants have taken samples or arranged for samples to be taken of storm water discharges at the Facility.

92.    In storm water sampling results submitted to the Regional Board for the past three years, the Facility has consistently reported high pollutant levels from its storm water sampling results.

93.    The Facility has reported numerous discharges in excess of narrative and numeric water quality standards established in the Basin Plan. These observations have thus violated narrative and numeric water quality standards established in the Basin Plan and have thus violated Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the General Permit; and are evidence of ongoing violations of Effluent Limitation V(A) of the Permit.

94.    The Facility has reported violations of the narrative water quality standards for discoloration, turbidity, and suspended solids contained in the Basin Plan.

95.    Specifically, the levels of TSS in storm water detected by the Facility have exceeded the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and the State Board, respectively.

96.    For example, on January 19, 2016, the TSS level at the facility was measured at 207 mg/L.  Defendant also has measured levels of TSS in excess of 100 mg/L in storm water discharged from the Facility on December 22, 2015 and December 15, 2016.

97.    The levels of Iron in storm water detected by the Facility have exceeded the WQO established by the Basin Plan of 0.3 mg/L for iron and SMCL for iron of 0.3 mg/L.    For example, on December 15, 2016, the Iron level at the facility was measured at 8.3 mg/L. That level is over 27 times the WQO and SMCL for Iron.   Defendant also has measured levels of Iron in excess of 0.3 mg/L in storm water discharged from the facility on January 10, 2017, and January 19, 2017.

98.    The levels of pH in storm water detected by the Facility have been outside the acceptable range of 6.5 – 8.5 S.U. established by the Basin Plan for pH.  For example, on December 22, 2015, the level of pH measured from one of the Facility's storm water outfalls was 11 S.U.  Defendant also has measured levels of pH outside of the range of 6.5 – 8.5 S.U. in storm water discharged from the Facility on November 2, 2015; and January 19, 2016.

99.    The Facility did not sample and analyze any storm water run-off after January 19, 2017.

Failure to Comply with Required Exceedance Response Actions

100.    On July 2, 2017, Harbor Ready Mix was elevated to Level 1 Status for annual average exceedances of Iron.

101.    Pursuant to Section XII of the General Permit, Harbor Ready Mix's Level 1 ERA Report was due to be prepared and uploaded into SMARTS by January 1, 2018.

102.    To date, Defendants have failed to submit an adequate Level 1 ERA Report.

**FIRST CAUSE OF ACTION**
**Failure to Follow NDPES Coverage Requirements of the General Permit**
**Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

103.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

104.    The General Permit contains, in Attachment A, a list of Standard Industrial Classification (SIC) Codes which indicate the types of facilities which must apply for coverage under the General Permit.

105.    Harbor Ready Mix's SIC Code (reflecting its primary operation) is included among those industries which must apply for General Permit coverage.

106.    Defendant NORCAL MATERIALS, INC. operated without General Permit coverage at the Facility between October 2, 2017, and December 5, 2018.

107.    Each day since at least October 2, 2017, that Defendant NORCAL MATERIALS, INC. failed to apply for General Permit coverage in violation of the General Permit is a separate and distinct violation of the General Permit. Noncompliance with the General Permit constitutes a violation of the CWA against all Defendants.  General Permit § XXI.A; 33 U.S.C. § 1342.

**SECOND CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

108.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

109.    The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

110.    As outlined herein, Defendants have failed to develop and implement an adequate SWPPP for the Facility.

111.    Each day since July 1, 2015, that Defendants failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

112.    Defendants have been in violation of the SWPPP requirements every day since July 1, 2015 and continue to be in violation of the SWPPP requirements each day that Defendants fail to develop and fully implement an adequate SWPPP for the Harbor Ready Mix facility.

///

### THIRD CAUSE OF ACTION
### Failure to Develop and Implement an
### Adequate Monitoring and Reporting Program
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

113.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

114.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

115.    As outlined herein, Defendants have failed to develop and implement an adequate monitoring and reporting program for its Facility.

116.    Defendants' ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by their failure to collect storm water samples pursuant to the requirements of the General Permit.

117.    Each day since at least July 1, 2015, that Defendants failed to develop and implement an adequate monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants. The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

118.    Noncompliance with the General Permit constitutes a violation of the CWA against all Defendants. General Permit § XXI.A; 33 U.S.C. § 1342.

**FOURTH CAUSE OF ACTION**
**Submission of False Annual Reports and a False SWPPP**
**to the Regional Water Board**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

119.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

120.     Section XVI of the General Permit requires that all Annual Reports and SWPPPs submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L) which provides significant penalties for submitting false information.

121.     Specifically, Clean Water Action section 309(c)(4) and Section XXI(N) of the General Permit provide a maximum penalty to any person who knowingly makes a false material statement, representation or certification in any record or other documents submitted or required to be maintained under the General Permit, including Annual Reports and SWPPPs, up to and including a fine of $10,000 and imprisonment of two years, or both.

122.     As delineated herein, Defendant BOBBY LEE MANN made false representations in the Harbor Read Mix Facility's Annual Report for the reporting period 2017-18, claiming that the Facility was unable to sample the required number of QSEs during the reporting year for all discharge locations because there were insufficient QSEs in the vicinity of the Facility during operating hours.

123.     In fact, there were numerous QSEs during the reporting year during operating hours, according to NOAA records, such that the Facility could have easily collected the required number of samples.

124.     At the time that Defendant BOBBY LEE MANN made the false representation referred to above, he knew or should have known that the representations were false but

proceeded nonetheless to certify under penalty of law to the Regional Water Board that the information contained in the Annual Reports was true and correct.

125.    In addition, Defendant ROBERT McGEHEE made false statements in the Facility's SWPPP uploaded into SMARTS on November 30, 2018, when he indicated that the SWPPP had been prepared by him on December 1, 2017 and implemented as of January 1, 2018.

126.    Each time since July 1, 2018, that Defendants submitted false statements to the Regional Water Board under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**FIFTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

127.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

128.    The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

129.    Defendants failed to implement BAT and BCT at the Facility for its discharges of Iron, TSS and other potentially un-monitored pollutants, in violation of Effluent Limitation V(A) of the General Permit.

130.    Each day since at least November 2, 2015, that Defendants failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

### SIXTH CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

131.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

132.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

133.    Plaintiff is informed and believes, and thereupon alleges, that since at least November 2, 2015, Defendants have been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

134.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at both facilities, becoming contaminated with iron, sediment and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water then flows untreated into Redwood Creek, which flows into the San Francisco Bay.

135.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water

quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

136.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

137.    Every day since at least November 2, 2015, that Defendants have discharged and continues to discharge polluted storm water from its Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.  These violations are ongoing and continuous.

**SEVENTH CAUSE OF ACTION**
**Failure to Comply with Required Exceedance Response Actions**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

138.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

139.    The General Permit requires that all Dischargers who enter Level 1 or Level 2 status comply with specific Exceedance Response Actions delineated in Section XII of the General Permit.

140.    On July 1, 2017, Harbor Ready Mix entered Level 1 status for Iron.

141.    As herein alleged, Defendants have failed to date to comply with the Exceedance Response Actions required of it by the General Permit.

142.    Each day since October 1, 2017, that Defendants fail to comply with the Exceedance Response Actions required by the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.      Declare Defendants to have violated and to be in violation of the CWA;

2.      Issue an injunction ordering Defendants to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.      Enjoin Defendants from discharging pollutants from the Harbor Ready Mix Facility to the surface waters surrounding the Facility until such time as Defendants develop and implement an adequate SWPPP and implement appropriate BMPs;

4.      Order Defendants to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.      Order Defendants to take appropriate actions to restore the quality of United States waters impaired by its activities at the Harbor Ready Mix facility;

6.      Order Defendants to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and;

7.      Award such other and further relief as may be just and proper.

Dated:  December 10, 2018                    Respectfully,


By:  ___/S/_____
        Hans W. Herb
        Attorney for Plaintiff